United States District Court
Southern District of Texas
FILED

JUL 0 6 2004

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ANNA C. RECIO,<br>　　　Plaintiff, | §<br>§<br>§ | |
| VS. | §<br>§ | CIVIL ACTION NO. B-03-122 |
| JO ANNE B. BARNHART,<br>Commissioner, Social<br>Security Administration,<br>　　　Defendant. | §<br>§<br>§<br>§<br>§ | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pending before the Court is a Motion for Summary Judgment (Docket No. 10) filed by

Plaintiff, Anna C. Recio ("Recio").  Also pending before the court is a Motion for Summary

Judgment (Docket No. 14) filed by Defendant, Jo Anne B. Barnhart ("Commissioner).  For the

reasons set forth below, it is recommended that the case be remanded for further proceedings.

### I. Procedural Background

Recio filed an application for Supplemental Security Income payments on August 13,

2001.  In her application, Recio claimed a disability based on clinical depression.  The claim was

denied and she filed a request for a hearing on July 7, 2002.  A hearing was held before an

Administrative Law Judge ("ALJ") on February 6, 2003.  The ALJ found that Recio had a

Residual Functional Capacity ("RFC") for unskilled work with moderate limitations in

concentration and that she could do the jobs identified by the vocational expert.  The ALJ

rendered a decision on March 28, 2003, concluding that although Recio was clinically depressed,

she was not disabled.  On May 16, 2003, the Appeals Council denied Recio's request for a

1

review of the ALJ's decision. Recio is now seeking judicial review pursuant to 42 U.S.C §

405(g).

## II. Administrative Decision of the ALJ

### A. Claimant Profile

Recio was forty-eight years old at the time of the hearing, which is defined in the

regulations as a "younger individual" according 20 C.F.R. § 416.936. Recio did not complete

high school, but received a General Education Diploma (GED). Recio's employment history

includes work as an accounts receivable clerk, waitress, legal secretary, and bartender. The ALJ

determined that Recio has no "past relevant work" as defined at 20 C.F.R. § 416.965 because the

work was either not performed within the last fifteen years and/or did not last long enough for the

claimant to learn to do the job and meet the definition of "substantial gainful activity."

### B. Medical Evidence

#### 1. Treating Physician, Dr. Juan A. Maldonado

Dr. Juan A. Maldonado, Recio's treating physician, reported on June 7, 2000, that Recio

"can perform activities such as sit, stand, walk, lift, carry, handle objects, hear, speak, and

travel."[1] Dr. Maldonado concluded that Recio's "memory, concentration, social interaction and

adaptation to change and stress may be affected secondary to her current psychiatric condition."[2]

---

[1]Letter from Dr. Juan A. Maldonado to the Texas Rehabilitation Commission, Administrative Transcript, p. 196 (Docket No. 7).

[2]Id.

2

### 2. Visual Impairment Consultant, Dr. Reagan B. McMillin

McMillin examined Recio on September 27, 2001.  Recio stated a history of poor central vision in the right eye due to an injury sustained over thirty years ago and complained of intermittent eye pain in the left eye coupled with tearing and photophobia, which lasts for several hours, occurring every four to six months.  McMillin reported that Recio has small macular scar in the right eye, her best corrected vision in the right eye is 20/30 and 20/20 in the left eye, and the pain represents a variant of a cluster headache.[3]

### 3. Examining Consultative Physician, Dr. William M. Valverde,

Valverde examined Recio on December 13, 2001, and diagnosed her as having "major depression, recurrent, moderate severity, without psychotic features (as evidenced by depressed mood, sleep disturbance, reclusiveness, suicide attempts).  Recio stated that her daily activities include taking her daughter to school, reading, watching television, and eating prepared meals such as TV dinners.  Valverde's prognosis was that Recio, "...[has] received extensive treatment and has made a moderate recovery.  Her prognosis is good, but guarded."[4] Recio indicated that she was taking several medications including Wellbutrin SR 200 mg, Effexor XR 30 mg, Seroquel 10 mg, Dexedrine Spansuels 30 mg, Ranitidine 150 mg, and cortisone creme for psoriasis.  Valverde noted that, "...[Recio] appear[s] to have concentration difficulties"; "...her judgment is impaired...she apparently acts in an impulsive way with potential for self-injury"; and "...her history and performance would indicate that she can carry through with most tasks to

---

[3]Letter from Dr. Reagan B. McMillin to Dr. Juan A. Maldonado, Administrative Transcript, p. 199 (Docket No. 7).

[4]Examination Report, Administrative Transcript, p.188 (Docket No. 7).

completion. However, it would appear that tasks of some complexity are more difficult for her and she tends to lose focus on what she is doing."[5]

#### 4. State Agency Reviewing Physician, Dr. Richard J. Alexander

Alexander reported on December 21, 2001, that Recio had recurrent major depression of a moderate severity without psychosis, classified as an "affective disorder" under category 12.04.[6] Alexander indicated Recio's condition resulted in "moderate" functional limitations. Therefore, Recio's mental disorder moderately restricts the activities of daily living and results in moderate difficulties in maintaining social function, concentration, persistence, or pace.[7] Alexander also indicated that Recio is "moderately" limited in certain mental activities as noted in the Mental Residual Functional Capacity Assessment Form (SSA-4734-BK-SUP).[8] Those activities include the ability to (1) understand and remember detailed instructions, (2) to carry out detailed instructions, (3) maintain attention and concentration for extended periods, (3) work in coordination with or proximity to others without being distracted by them, (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (5) ability to interact appropriately with the general public, (6) ability to accept instruction and respond appropriately to criticism from supervisors, (7)respond appropriately to changes in the work setting.

---

[5]Id.

[6]Psychiatric Review Technique Form SSA-2506, Administrative Transcript, p. 174 (Docket No. 7).

[7]Id. at 181.

[8]Administrative Transcript, p. 191 (Docket No. 7).

### C. Vocational Expert (VE) Testimony, Dr. Imro Marini

The ALJ posed a hypothetical question to the VE and asked him to comment as to availability of jobs in the national economy that a person with Recio's limitations could perform. Specifically the ALJ stated, "I want you to assume a person of Ms. Recio's age, education, and work experience. I want you to assume that she had a mental condition of depression. A person that age, education, vocational experience had such a thing as depression and that that depression led to symptoms and restrictions that she indicated here today, including fear of going out, ...feeling anxious, having trouble concentrating or focusing on a task to the extent that she has many many things go through her mind and can't seem to put them together to focus on one or two, ...crying throughout the day, ...feel[ing] very low on the depression scale, even with medication." [TR 46-47]. The discussion below then followed: [TR 23-36]

VE:   Well, she wouldn't be able to go back to any of her former jobs, Your Honor, which involved a lot of dealing with the public and all of her jobs, even the ones [in] the past 15 years, were all skilled or semi-skilled. Is there any way you could more definitively tell me a little bit more about the concentration with regards to an RFC area?

ALJ:  Yes. ...as I understand her, even a simple type job, let's say that she had to just stay on task to do a one or two step job. If I understand her, she's got so many things going through her mind, ...she doesn't complete that task.

VE:   There would probably be some jobs, Your Honor, but not on a sustained SGA basis. It wouldn't be competitive employment. If she could focus for a couple of hours in an eight hour day, that wouldn't be good enough.

ALJ:  So she would have to stay focused the majority of the day?

VE:   Yeah.

ALJ:  Let me ask you to assume a person Ms. Recio's age, education, and work experience had no problem with the physical parts of the job and she had good understanding, but her memory, concentration, social interaction, and adaptation to change and stress may be affected because of a psychiatric problem and that she has much anxiety.

ALJ:  With respect to unskilled work, what type of concentration and adaptation to change and stress does one need?

VE:   Well, mostly for unskilled work you're talking about routine, repetitive tasks that typically don't

5

involve significant degree of concentration for a number of jobs, but do involve, of course attending to the task to some degree.

ALJ:    Okay, so the distinction you're making here is that [for] the [unskilled] jobs you don't need to have a great deal of concentration, but you got to tend to that task to get the task done.

VE:     Correct, yeah.

ALJ:    Okay.  ...[I]f one had a moderate limitation with respect to staying on task?

VE:     Yeah.  If one had a moderate limitation of staying on task, they would be able to do their work but have periods of difficulty where in her case, let's say it would be difficulty in concentrating.

ALJ:    ...[W]hen you're looking at the unskilled jobs, the wide range of them, would a significant number of them be eroded if she had the moderate difficulty in concentrating and persistence and pace?

VE:     I'd probably go right up the middle and say about 50 percent.

ALJ:    What types of jobs would be left then?

VE:     The jobs which she likely wouldn't lose her job over making mistakes because that would be the key factor in all this, is whether or not when she did lose concentration – and again, these would all be jobs that didn't really involve working with the public, these unskilled jobs.  It would be a matter of is she making so many mistakes that an employer would fire her or is she making, you know, mistakes that are kind of forgivable because every body has – there isn't anyone in the workforce, as you know, that has 100 percent productivity rate.  I think its 75 percent, at best.

ALJ:    Well now, what kind of jobs are you referring to that we just talked about?  I'm interested in a couple names of type jobs.

VE:     Yeah.  I think she could probably do a food sorter position.

ALJ:    Okay.  And that's checking

VE:     Yeah, checking for bad fruit, bad vegetables, you know, visual acuity is fine.  No physical limitation.  Similarly, there would be – do I need to give you numbers for that?

ALJ:    Yeah.

VE:     There's, I think, 1500 unskilled, light positions in Texas and over 20,000 in the US.

ALJ:    Just another type.

VE:     Sure, sure.  There would be electronics worker that essentially cleans and trims mold off different computer chip components and that -- in Texas there are about 1900 unskilled, light positions, and 26,000 in the US.

ALJ:    Assuming she had moderate restriction of activities of daily living, difficulty in maintaining social functioning was moderate, and difficulty in maintaining concentration, persistence, or pace was moderate and that she had one or two episodes of decompensation.  I'm using moderate to stand between none and marked and mild would be before moderate.  How would that affect the two jobs that you referred to me?

6

VE:    Well again, Your Honor, you know I go back to the definition of moderate which indicates there's some disability but it does not preclude work.

ALJ:    And to the fact that we have three of them does not preclude work?

VE:    Yeah.

ALJ:    Because of your vocational experience

VE:    Right.

ALJ:    Based on that definition of what moderate is?

VE:    Correct.

### D.  Claimant Testimony

The ALJ asked Recio about any limiting physical problems and she responded that she has painful psoriasis all over her body. [TR 9]. Recio also stated that she has trouble with her teeth, but was not currently receiving treatment. [TR 9]. When asked about her daily activities, Recio responded that she usually does not clean around the house [TR 9], will sometimes take her daughter to school [TR 9], reads, sleeps, and communicates in computer chat rooms [TR 10]. Other conditions that Recio experiences are physical shaking [TR 11], trouble writing [TR 11], anxiety [TR 11], trouble focusing her thoughts [TR 11], memory loss [TR 19], fear of change [TR 21], nervousness around people [TR 14], and daily crying episodes [TR 7].

### E.  RFC and Disability Determination

The ALJ found that the medical evidence indicates that Recio has depression, an impairment that is "severe" within the meaning of the regulations, but not severe enough to meet or medically equal one of the impairments listed in 20 CFR Pt. 404, Subpt. P, App. 1. [TR 17]. Recio has not engaged in "substantial gainful activity," as defined in 20 C.F.R. § 416.972, since her alleged onset date [TR 16] and has no "past relevant work" [TR 18] as defined in 20 C.F.R. § 416.965. Based on his assessment of Recio's personal testimony and the physicians' medical

opinions and diagnoses, the ALJ found that Recio retained the RFC to perform (1) unskilled work at all levels of exertion with moderate limitations in concentration and (2) a "significant" range of heavy work. [TR 20].

ALJ found that Recio was "not disabled" and used Medical Vocational Rule 204.00[9] as a "framework" for his decision. [TR 19].  The Medical Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work as a given level of exertion and /or has any non-exertional limitations.  The ALJ noted that Recio cannot perform the full range of heavy work.  "The claimant's ability to perform all or substantially all of the requirements of heavy work is impeded by additional exertional and /or non-exertional limitations." [TR 19].

## II.  Party Contentions

## A. Recio's Arguments

### 1.  General Summary

Recio claims that the ALJ "failed to assess specific work related mental limitations and the vocational expert had to speculate on the degree of the plaintiff's limitations."[10]  Recio argues that the hypothetical question to the VE was not consistent with the evidence and the VE's testimony did not support the ALJ's finding that there was a significant number of jobs available

---

[9]*Maximum sustained work capability limited to heavy work (or very heavy work) as a result of severe medically determinable impairment(s).*  The residual functional capacity to perform heavy work or very heavy work included the functional capability for work at the lesser functional levels as well, and represents substantial work capability for jobs in the national economy at all skill and physical demand levels.  Individuals who retain the functional capacity to do heavy work (or very heavy work) ordinarily will not have a sever impairment or will be able to do there past work - either of which would have already provided a basis for a decision of "not disabled".

[10]Plaintiff's Motion for Summary Judgment, p. 3-4 (Docket No. 10).

in the national economy.[11]

## 2. Social Security Ruling 85-15

Recio relies upon Social Security Ruling (SSR) 85-15 for her argument that the ALJ did not properly consider whether her mental disorder allows her to perform unskilled work. Recio claims that SSR 85-15 prohibits an ALJ from assuming that the failure of a mental disorder to meet or equal a listed impairment, automatically translates into an ability to do "unskilled" work. Recio states that the ALJ, "put the cart before the horse by first assuming that the plaintiff could do unskilled work"[12] and then asking the VE to evaluate the extent to which Recio's mental limitations would affect her ability to do unskilled work.

Recio contends that the ALJ incorrectly elicited the VE's opinion as to the abilities required to perform "unskilled" work. The ALJ should have used the medical experts opinions and evidence about Recio's mental disorder to determine whether she was even capable of performing unskilled work.

## 3. Social Security Ruling 96-8p

Recio also argues that the ALJ improperly substituted the functional limitations set forth in the Psychiatric Review Technique Form (PRTF), SSA-2506-BK [TR. 181], prepared by Dr. Richard M. Alexander, M.D., as his RFC assessment at the fourth and fifth steps of the sequential evaluation process for determining disability as set forth at 20 C.F.R. § 416.920(a)(4)(i)- (v). Recio urges that SSR 96-8p states that the limitations, as reported on the PRTF, are not an RFC assessment for purposes of the fourth and fifth step evaluations, but rather

---

[11]Plaintiff's Motion for Summary Judgment, p. 7-8 (Docket No. 10).

[12] Plaintiff's Motion for Summary Judgment, p. 6 (Docket No. 10).

9

a rating of the "severity" of Recio's mental impairment, which is pertinent only to the determinations made at steps two and three[13] of the sequential evaluation process.

Recio also claims that the ALJ's reference to "moderate" limitations in concentration in his RFC assessment was improper. SSR 96-8p holds that such vague assessments should not be used in RFC findings, as the ALJ should specify which work activities are affected by Recio's mental limitations and to what extent.

### 4. Social Security Ruling 96-9p

Recio argues that SSR 96-9p specifically provides that mental limitations may cause a significant erosion of the occupational base for unskilled "sedentary" work and would justify a finding of disabled. Recio claims that work at the other exertional levels would be similarly adversely affected.

### 5. VE Testimony

Recio submits that the VE's testimony regarding the availability of jobs that Recio could perform in the national economy is dubious because it has no reliable basis. When questioned about the erosion of the occupational base for someone with Recio's moderate limitations, he responded, "I'd probably go right up the middle and say about fifty percent". Recio challenges the VE's figure and proposes that a more realistic percentage would be thirty-three percent, as three different functioning areas are affected by Recio's mental impairment, (i.e. daily activities,

---

[13] (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

social functioning, and concentration). Recio also criticizes the ALJ's decision for failing to establish that (1) that the VE testimony is based upon sufficient facts and data, (2) the testimony is a product of reliable principles and methods, and (3) the VE applied the principles and methods reliably to the facts of the case.

### B. The Commissioner's Arguments

The Commissioner contends that the ALJ properly assessed Recio's RFC and the ALJ's questioning of the VE properly reflected Recio's RFC. The Commissioner argues that the VE's testimony supported the ALJ's finding that there were a significant number of jobs available in the national economy that Recio could perform.

The Commissioner claims that SSR 85-15 only applies to situations in which the claimant suffers an alleged mental impairment that causes a severe adverse reaction to even the mildest demands of work, citing *Leggett v. Charter*, 67 F.3d 558, 565 (5th Cir. 1995).

As to the ALJ's questioning of the VE, the Commissioner contends that the VE is familiar with the specific requirements of a particular occupation, including working conditions and can properly testify regarding the attributes and skills needed to perform a particular job. The Commissioner indicates that the VE relied on his own expertise in addition to vocational sources, therefore the ALJ properly accepted the testimony as to the existence of jobs that Recio could perform. The Commissioner notes that Recio is not challenging the ALJ's determination of her physical capabilities.

### III. Standard of Review

### A. Summary Judgment

Summary judgment evidence is viewed in the light most favorable to the non-movant.

11

*Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 456-58 (1992). Summary judgment is proper only when it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An alleged factual dispute will not defeat a motion unless it is genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "material" if it involves a fact that might affect the outcome of the suit under governing law. *Douglass v. United Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). Once the movant establishes the absence of a factual dispute, the burden shifts to the non-movant to show that summary judgment is inappropriate.

### B. Judicial Review Under 42 U.S.C. § 405(g)

"The judicial role in social security matters... is limited by 42 U.S.C. § 405(g)." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir.1983). Judicial review of a final decision by the Commissioner to deny benefits is limited under 42 U.S.C § 405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

As used in this context, the term "substantial evidence" means more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990); *see also Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000); *Brown*, 192 F.3d at 496. Consequently, when determining the existence of substantial evidence, the court may not reweigh the evidence, decide issues *de novo*, or substitute its judgment for that of the administrative fact finder. *Brown*, 192 F.3d at 496; *see also Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).

12

A claimant bears the burden of proving he or she is disabled. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C § 423(d)(1)(A). Furthermore, a claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 423(d)(2)(A). Pursuant to 20 C.F.R §§ 404.1520 and 416.920, the legal standard for determining disability is to be applied using a five- step sequential process. *See also Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1991).

In evaluating a disability claim, the Commissioner must follow a five-step process to determine: (1) whether the claimant is currently engaging in substantial gainful activity; (2) whether the claimant's impairment or combination of impairments is severe; (3) whether the severe impairment is the same as, or equivalent to, an impairment described in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); (4) whether the impairment prevents the individual from engaging in relevant work he has done in the past; and (5) whether other work exists in the national economy which the claimant can perform. 20 C.F.R § 404.1520(a)-(f); *Bowling*, 35 at 435.

The claimant bears the burden of proof on the first four steps described above and the Commissioner bears the burden on the fifth step. *Brown*, 192 F.3d at 498; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. denied, 514 U.S. 1120 (1995). If there is a finding of not

13

disabled in any part of the five-step process, the inquiry ends. *Greenspan*, 38 F.3d at 236.

## IV. Analysis

### A. Sequential Evaluation Process

The ALJ made the following findings in accordance with the five-step sequential process

for determining disability: [TR 20].

> Step 1: "The claimant has not engaged in substantial gainful activity since the alleged onset of disability."
>
> Step 2: "The claimant's depression is a severe impairment, based upon the requirements in the Regulations. (20 C.F.R. § 416.921)."
>
> Step 3: "This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4."
>
> Step 4: "The claimant has no past relevant work. (20 C.F.R. §416.965)."
>
> Step 5: "The claimant has a residual functional capacity to perform a significant range of heavy work. (20 C.F.R. § 416.967)[14]." "The claimant has the following residual functional capacity: perform unskilled work at all levels of exertion with moderate limitations in concentration." "Although the claimant's exertional limitations do not allow her to perform the full range of heavy work, using Medical-Vocational Rule 204.00 as a framework for decision making, there are a significant number of jobs in the national economy that she could perform."

Recio does not contest the ALJ's findings at the first, second, third and fourth steps. It is only

the fifth step, upon which the burden rests with the Commissioner, that Recio takes issue with.

At step five of the evaluation process, where the claimant has a severe medically determinable

impairment which, though not meeting or equaling the criteria in the Listing of Impairments,

prevents the claimant from doing past relevant work, it must be determined whether the person

---

[14](d) *Heavy Work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

14

can do other work.  This necessarily involves consideration of the claimant's RFC and the

vocational factors of age, education, and work experience.

### 1. Exertional / Nonexertional Limitations

The ALJ determined that Recio had exertional limitations prohibiting her from

performing the full range of heavy work.  Exertional capacity addresses an individual's

limitations and restrictions of physical strength and defines the individual's remaining abilities to

perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing,

and pulling.  The ALJ, in his written opinion, did not discuss the basis for his conclusion that

Recio had exertional limitations.

Aside from Recio's vision, eye pain, and psoriasis, there is no indication in the record that

she is limited with respect to the any of the seven strength demands.  It appears that Recio's only

limitations are nonexertional.  Nonexertional capacity considers all work-related limitations and

restrictions that do not depend on an individual's physical strength and assesses an individual's

abilities to perform: (1) physical activities such as postural (e.g., stooping, climbing), (2)

manipulative (e.g., reaching, handling), (3) visual (seeing), (4) communicative (hearing,

speaking), and (5) mental (e.g., understanding and remembering instructions and responding

appropriately to supervision).

Doctor McMillin indicated that Recio had eye pain which is possibly the result of a

headache and a scar in her right eye with best corrected vision at 20/30.  Doctors Valverde,

Alexander, and Maldonado all indicted Recio had major recurrent depression with a past suicide

attempt.  All of these limitations appear to be nonexertional.

15

## 2. Social Security Ruling (SSR) 85-15:

Social Security Rulings are published in the Federal Register under the authority of the Commissioner and are binding on all components of the Social Security Administration. The rulings represent precedent final opinions and orders and statements of policy and interpretations of the Social Security Act which have been adopted by the Administration. *See* 20 C.F.R. § 402.35(b)(1).

Recio argues that SSR 85-15 titled "CAPABILITY TO DO OTHER WORK — THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS" states that the ALJ may not assume that failure of a mental disorder to meet or equal a listed impairment equates with an ability to do unskilled work. In other words, just because the claimant's mental disorder is not a "listed impairment" does not mean that he/she has the ability to do unskilled work. SSR 85-15 clarifies policies applicable in cases involving the evaluation of solely nonexertional impairments. It was drafted for the purpose of emphasizing that (1) the potential job base for mentally ill claimants, without adverse vocational factors, is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis, and (2) a finding of disability can be appropriate for an individual who has a severe mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

SSR 85-15 sets forth the factors that should be addressed by the ALJ in cases where the claimant's nonexertional impairment consists of a mental illness:

16

"The decision maker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work. The decision requires careful consideration of the assessment of RFC." "Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base."

SSR 85-15 also addresses the issue of stress as it relates the claimant's mental illness and calls to attention its importance in the RFC assessment.

"Since mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands or "stress" of the workplace is often extremely difficult." "The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances." "Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job."

The Commissioner argues that SSR 85-15 does not pertain to this case because it "applies only to situations in which the claimant suffers an alleged mental impairment that causes a severe adverse reaction to even the mildest demands of work", quoting *Leggett v. Chater*, 67 F.3d 558 (5th Cir. 1995). The court in *Legett* appears to be referring to the language in SSR 85-15 which discusses stress as it relates to mental illness and states that "mental illness is characterized by adverse responses to seemingly trivial circumstances."

17

The Commissioner's reliance on Legett is misplaced. The conclusion that SSR-15 does not apply because "Recio was only *moderately* limited in her ability to handle most work related duties" is incorrect. Recio has a mental impairment which the ALJ found was a "severe medically determinable impairment." The language in SSR 85-15 merely elaborates as to the functional considerations of a mentally ill person as they relate to the ability to cope with stress in the workplace.

The ALJ found that Recio could perform "unskilled" work at all levels of exertion, but does not provide any basis for this conclusion. It appears that the ALJ incorrectly assumed that Recio's mental limitations did not affect her ability to unskilled work. As SSR 85-15 makes clear, this assumption is unwarranted. A person with a mental impairment may not even be able to do unskilled work, depending on the type of job and the duties required.

### 3. Social Security Ruling (SSR) 96-8p

#### a. Use of Limitations Identified on the PRTF for RFC Assessment

Recio argues that SSR 96-8p stands for the proposition that the limitations identified on the Psychiatric Review Technique Form (completed at the lower levels of adjudication) are not an RFC assessment, but rather a rating of the claimant's mental impairment at steps 2 and 3 of the evaluation process. Recio contends that the ALJ failed to make his own detailed mental RFC assessment addressing all of the functional areas when he merely adopted the assessments made by others at the second and third steps of the evaluation process.

SSR 96-8p entitled "ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS" states that the RFC assessment must first identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,

including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945.

Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light,

medium, heavy, and very heavy.

The functions listed in paragraphs (b),(c), and (d) are broken into distinct categories.

(b) *Physical abilities*.  When we assess your physical abilities, we first assess the nature
and extent of your physical limitations and then determine your residual functional
capacity for work activity on a regular and continuing basis. A limited ability to perform
certain physical demands of work activity, such as sitting, standing, walking, lifting,
carrying, pushing, pulling, or other physical functions (including manipulative or postural
functions, such as reaching, handling, stopping, or crouching), may reduce your ability to
do past work and other work.

(c) *Mental abilities*.  When we assess your mental abilities, we first assess the nature and
extent of your mental limitations and restrictions and then determine your residual
functional capacity for work activity n a regular and continuing basis.  A limited ability to
carry certain mental activities, such as limitations in understanding, remembering, and
carrying out instructions, and in responding appropriately to supervision, co-workers, and
work pressures in a work setting, may reduce your ability to do past and other work.

(d) *Other abilities affected by impairment(s)*.  Some medically determinable
impairment(s), such as skin impairments, epilepsy, impairment(s) of vision, hearing or
other senses, and impairment(s) which impose environmental restrictions, may cause
limitations and restrictions which affect other work related abilities.

RFC is the individual's maximum remaining ability to do sustained work activities in an

ordinary work setting on a regular and continuing basis, and the RFC assessment must include a

discussion of the individual's abilities on that basis.  A "regular and continuing basis" means 8

hours a day, for 5 days a week, or an equivalent work schedule.  Therefore, the RFC assessment

is a function-by-function assessment based upon all of the relevant evidence of an individual's

ability to do work-related activities.

"At step 5 of the sequential evaluation process, RFC must be expressed in terms of, or
related to, the exertional categories when the adjudicator determines whether there is

other work the individual can do. However, in order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." 60 Fed. Reg. 34,478 (July 2, 1996).

SSR 96-8p clarifies that the determinations made in the Psychiatric Review Technique From (PRTF) are not an RFC assessment, but merely a rating of the severity of the condition as the second and third step of the evaluation process. With regard to the PRTF, SSR 98-6p states,

"The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF. The ALJ is required to address the exertional and nonexertional capacities of the individual in the RFC assessment.

In this case, the ALJ did not appear to evaluate Recio's exertional and nonexertional capacities. Although he determined Recio could perform a "significant" range of heavy work, there was no discussion of Recio's ability to lift up to one hundred pounds, as is required to perform heavy work. The ALJ simply proffered the conclusion that Recio's "ability to perform all or substantially all of the requirements of heavy work is impeded by additional exertional and /or non-exertional limitations." [TR 19]. The ALJ did not make a definitive finding of the existence or the type of limitations possessed by Recio. The use of the connector "and/or" creates confusion. It is unclear whether the ALJ found that Recio had only exertional limitations, or only non-exertional limitations, or both.

In addition, it appears that the ALJ inappropriately supplanted the ratings of the PRTF for

20

his own RFC assessment. The findings indicated on the PRTF, done at steps two and three of the evaluation, only focus on the "severity" of the impairment. *See* 20 C.F.R. § 416.920a. An impairment is not considered severe if it does not significantly limit one's physical or mental ability to do "basic work activities" as listed at 20 C.F.R. § 416.921(b). However, the RFC assessment made at the fourth and fifth steps requires a more detailed investigation of the claimant's abilities. RFC assessment must be based on all of the relevant evidence in the case record, such as medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, evidence from attempts to work, need for a structured living environment, and work evaluations, if available. *See* SSR 98-6p.

As summarized on the PRTF, Doctor Alexander indicated Recio's condition resulted in "moderate" functional limitations and that Recio's mental disorder "moderately" restricts the activities of daily living and results in "moderate" difficulties in maintaining social function, concentration, persistence, or pace. Doctor Alexander also indicated that Recio is "moderately" limited in the mental activities as noted in the Mental Residual Functional Capacity Assessment Form (SSA-4734-BK-SUP). The ALJ appropriated the findings listed in the PRTF as his own, as evidenced in his written opinion. The ALJ reiterates the findings of the examining physicians and then states "For the reasons set forth above, I have found only moderate limitations in these areas." [TR 18]. Another example of this is found in the ALJ's question to the VE.

ALJ:   Assuming she had moderate restriction of activities of daily living, difficulty in maintaining social
       functioning was moderate, and difficulty in maintaining concentration, persistence, or pace was

21

> moderate and that she had one or two episodes of decompensation. I'm using moderate to stand between none and marked and mild would be before moderate. How would that affect the two jobs that you referred to me? [TR 33]

As the ALJ was making a determination at the fifth step of the evaluation process, he was required to make a more detailed investigation instead of relying solely on the previous observations and diagnoses. He did not. SSR 98-6p suggests that the proper inquiry would have focused on factors such as the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, effects of symptoms, evidence from attempts to work, and the need for a structured living environment.

Although the VE identified the jobs of food sorter and electronics worker as other work that Recio could perform, there is ample evidence in the record that contraindicates Recio's alleged ability to perform the required duties.

### (1) "Physical Abilities" / Paragraph (b) Factors

In assessing a claimant's RFC, consideration should be given to side effects of medication. In this case, Recio stated that she takes several mind altering medications which produces an array of side effects, potentially hampering her capability to perform the meticulous job of cleaning the mold off of electronic parts, i.e. the "other work" suggested by the VE, which Recio could perform in the national economy.

> *(Manipulative Functions)*
> ALJ:    Do you have any – some of those medications that you mentioned. Do any of them have any side effects?
>
> CLMT:  Oh, sure. I have trouble writing and stuff. I shake a lot.
>
> ALJ:    You shake a lot?
>
> CLMT:  Oh, yeah.

22

ALJ:    Are you nervous?

CLMT: Yes.

ALJ:    And anxious?

CLMT: All the time.
[TR 34]

_____

CLMT: I have trouble moving

ALJ:    Now, what do mean trouble moving?

CLMT: I have trouble doing – just walking and functioning , you know, to go to the kitchen and do something, wash some dishes.

ALJ:    Now, is it a physical problem or you're just –

CLMT: Well, the mental affects the physical, I believe.

ALJ:    Yeah.  But what I'm trying to say is that you just can't – what do you feel that you can't go from the couch to the kitchen?

CLMT: [The doctor] says it's a motor retardation.  It's like everything goes in my mind.  I'm doing everything mentally, but I'm still sitting there.  That happened a lot.  It still does.
[TR 30-31]

## (2) "Mental Abilities" / Paragraph (c) Factors

Although it may be difficult to distinguish whether various aspects of Recio's mental state are a result of the combinations of medications she takes (medicinal side effects), or a manifestations of the mental impairment itself (effect of the symptoms), it is clear that she experiences some mental dementia, memory loss, and social interaction skills which would certainly affect her understanding, remembering, carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, all of which do not appear to have been enveloped in the RFC analysis.

23

*(Understanding and Responding Appropriately)*

ALJ:    You did have an episode about seven, eight years ago according to the psychiatrist. I don't want to get personal or anything, but you're aware of what I'm talking about?

CLMT: Yes, the gang rape, yes.

ALJ:    And how have you been since then? I mean, he says that you seem to say you don't have any flashbacks or nightmare, which is good. I mean, I hope –

CLMT: I did for about a month and a half. I could n't –

ALJ:    Does that have anything to do with not wanting to go out of the house, though, I mean?

CLMT: No. I think when I broke up with my boyfriend, I'd rather have him back. *Go through a million rapes to get him back.* I mean, that was worse for me was the breakup. That was the consequence.

ALJ:    Of the rape? You broke up with your boyfriend. Was that afterwards?

CLMT: Before.

ALJ:    Oh, you broke up –

CLMT: The same night.
[TR 43]

---

VE:    Yeah. I think she could possibly be a food sorter position.

ALJ:    Okay, and that's checking –

VE:    Yeah, checking for bad fruit, bad vegetables, you know, visual acuity is fine. No physical limitations. Similarly, there would be – do I need to give you a number for that?

ALJ;    Yeah.

VE:    There's I think, 1500 unskilled, light positions in Texas and over 20,000 in US.

CLMT: May I say something about the fruit? It takes me hours to go through fruit at the grocery store. I guess –

ALJ:    To look – okay. Why?

CLMT: Comparison

ALJ:    Yeah. When you're looking for it, what happens? I mean, you're looking for good fruit right?

CLMT: Yeah.

ALJ:    And what do you do? Why does it take you hours? I'm asking you – what do you see there?

CLMT: Well, some of it's not heavy enough or smells good, you know, try to just get the best one.

24

ALJ:     Well with the fruit, do you actually spend a long time looking to see what's the best fruit?  That's a yes?

CLMT:  And sometimes I come back and see something better over here and come back and return it.

ALJ:     Okay.

CLMT:  Dreadful.  It's dreadful.
[TR 52]

_____

*(Remembering)*
ALJ:     You went to see a psychiatrist, a Dr. Valverde.  He stat that a couple of – actually three day before you went there, you tried to overdose on some pills.  Is that correct?

CLMT:  Did I?  I don't remember.
[TR 41]

_____

ATTY:  You lose your memory?

CLMT:  Oh, I have a horrible memory.  I can't remember sometimes.  I even – I didn't know what day it was.  I thought it was the beginning of the week.  I always have that problem.  I can't remember days sometimes.
[TR 42]

_____

*(Work Pressures and Adaptation to Change)*
ALJ:     Let's say you had a job interview tomorrow.

CLMT:  Uh huh.

ALJ:     How would you feel about getting dressed, going to that interview? Do you think you could actually go to it?

CLMT:  I don't know.

ALJ:     Does change affect you in any way?

CLMT:  Oh, I hate change.  It scares me.  Change is very scary
[TR40]

*(Responding Appropriately to Supervisors, Co-Workers / Social Interaction)*
ALJ:     Do you ever go grocery shopping?

CLMT:  Yeah, I go – like that's the only thing I do.  I usually go in the middle of the night.

ALJ:     What time?

CLMT:  Some times it takes me hours and hours.  It's about 12:00 to 6:00 in the morning sometimes.  I just

25

go down the aisles.

ALJ:    Do you try to avoid people?

CLMT:   Yes, but sometimes you have to – I have to go to the store.
[TR 40 - 41]

## (2) "Other Abilities" / Paragraph (d) Factors

### *(Vision)*

ALJ:    Do you wear glasses or you wear contacts?

CLMT:   I'm supposed to wear glasses, yeah.  I broke them, and lost them.

ALJ:    So, [the doctor] did give you a new prescription – a prescription for new glasses, you just haven't gotten them?

CLMT:   Right.

ALJ:    Okay.

CLMT:   I've been buying them at the dollar store to read.

ATTY:   Your glasses, does Medicaid cover them?

CLMT:   Yes, one every two years, I guess.  I broke them.

ATTY:   Can you get them now?

CLMT:   I think right now, but I don't think the prescription is right.  It's not right.  Because if I turn them upside down, I can see better with them upside down.  I just haven't gotten them fixed.
[TR 32-33]

––––––––––––––––––

ATTY:   Okay.  You mentioned two jobs, an electronics worker and food sorter.  The judge put some hypothetical limitations.  I want to go and add some limitations to that.  Take a person, add to it a person's limitations includ[ing] blurred vision, and somebody who takes hours trying to sort through fruit.  Could such a person be a food sorter?

VE:     No. With those two additions, no.

ATTY:   As far as the electronics worker, a person who has blurred vision –

VE:     Well, that would cancel that one right there.

ATTY:   My hypothetical is a person with impaired vision – blurred vision and a person who's just so unsure of herself that she can't decide when a product is ready to proceed to the next step, like an electronic workers would.  Would those limitations preclude the person from keeping a job like that?

VE:     If it was blurred vision, yeah. Yeah, because she would need good eye acuity on both jobs.

26

[TR 54-55]

*(Skin Impairments)*
ALJ:    Do you have nay physical problem I should know about that are limiting you?

CLMT: My psoriasis. It's pretty much all over my body. It's getting worse. It's painful.
[TR 31-32]

### b. Vagueness of RFC Findings

Recio argues that vague assessments should not be used in RFC findings. The section

entitled, "NARRATIVE DISCUSSION REQUIREMENTS" set forth in SSR 96-8p, requires that

the RFC assessment include a narrative discussion describing how the evidence supports each

conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence

(e.g., daily activities, observations). The adjudicator must discuss the individual's ability to

perform sustained work activities in an ordinary work setting on a regular and continuing basis

and describe the maximum amount of "each" work-related activity the individual can perform

based on the evidence available in the case record.

As previously noted, the ALJ's written opinion is devoid of a narrative discussion of the

medical and non-medical evidence in the record which supports his conclusion. His statement

that, "[a]fter completing a thorough and careful review of the pertinent medical and documentary

reports contained in the record, the undersigned finds that the preponderance of the most credible

evidence supports a conclusion that the claimant's symptomology would not preclude all work

related activities." [TR 18] does not describe the maximum amount of each work related activity

that Recio could perform based on all the evidence in the record.

27

### V. Decision Not Supported by Substantial Evidence

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Courts focus on four factors in assessing the substantiality of the evidence: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) age, education, and work history. *Martinez v. Chater*, 34 F.3d 172, 174 (5th Cir. 1995). District courts "may not re-weigh the evidence in the record, nor try issues de novo, nor substitute their judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (1988).

However, "[t]his standard of review is not a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's findings." *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir.1985). Courts must "scrutinize the record in its entirety to determine the reasonableness of the decision reached by the [Commissioner] and whether substantial evidence exists to support it." *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir.1992).

The ALJ failed to make the necessary inquiries regarding Recio's mental / physical limitations and document the specific considerations made in his RFC assessment, therefore depriving his finding of substantial supporting evidence. "It is the duty of the ALJ to fully and fairly develop the facts relative to a claim for benefits. When he fails in that duty, he does not have before him sufficient facts on which to make an informed decision... [and] his decision is not supported by substantial evidence." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (per

28

curiam).

Recio is a forty-eight year old woman, with a GED certificate, no past relevant work, and a documented mental impairment. From the record, it is clear that she has difficulty taking care of her own basic needs such as cooking, cleaning, shopping and getting out of the house, much less getting herself ready every morning, getting to work on time, and maintaining sustained concentration on the job for eight hours a day, five days a week. There is a lack of substantial evidence, as a reasonable mind would not accept that the evidence in the record is adequate to support the conclusion that Recio could perform the jobs of a food sorter or electronics worker. Recio's apparent shaking/hand tremors, vision, motor retardation, memory loss, and inability to interact socially with others, among others, cast into serious doubt her ability to perform the intricate job of an electronics worker, much less the selectivity required for a food sorter.

## VI. Recommendation

For the foregoing reasons, the Court recommends that the case be REMANDED to the Administrative Law Judge for further proceedings to be made in accordance with this Report and Recommendation.

A party's failure to file written objections to the proposed findings, conclusion, and recommendation in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy shall bar that party, except upon the grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusion accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

29

DONE at Brownsville, Texas, this __2nd__ day of July, 2004.

John William Black
United States Magistrate Judge